UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| KAREN WHITE THUNDER, | ) | CIV. 13-5036-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On August 19, 2010, Ms. White Thunder filed an application[1] for

Supplemental Security Income ("SSI") benefits under Title XVI of the Social

Security Act (the "Act"), 42 U.S.C. § 1381.  An evidentiary hearing was held

before an Administrative Law Judge ("ALJ") on September 18, 2012.

(Docket 16 at ¶ 4).  The ALJ issued a decision adverse to plaintiff on

September 20, 2012.  Id. at ¶ 3.  The Appeals Council denied Ms. White

Thunder's request for review.  Id.  The ALJ's decision is the Acting

---

[1]This was Ms. White Thunder's fifth application alleging an onset date of March 26, 2007.  She did not appeal the denial of the four prior applications. (Administrative Record, p. 206).  The court will cite to information in the administrative record by referencing "AR, p. _____."  The parties filed a Joint Statement of Material Facts ("JSMF").  (Docket 16).  The parties acknowledge Ms. White Thunder's fifth application is not in the certified record.  Id. at  ¶ 1.

Commissioner's final administrative decision for purposes of judicial review. (Docket 24 at p. 2).

Ms. White Thunder timely filed a complaint in district court.  (Docket 1).  Plaintiff seeks an order awarding benefits or, in the alternative, remanding her case for a new hearing.  (Docket 17).  The Acting Commissioner ("Commissioner") moves to affirm the decision of the ALJ. (Docket 23).  For the reasons stated below, plaintiff's motion is denied and defendant's motion is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 16) is incorporated by reference.  Further recitation of salient facts is included in the discussion section of this order.

On August 19, 2010, Ms.  White Thunder filed an application for SSI benefits.  Id. at ¶ 2.  On September 20, 2012, the ALJ issued a decision finding Ms. White Thunder was not disabled.  (AR, p. 24).   Ms. White Thunder timely appeals from that decision.  The issue before the court is whether the ALJ's decision of September 20, 2012, that Ms. White Thunder "has not been under a disability . . . since August 19, 2010 . . ." is supported by substantial evidence on the record as a whole.  (AR, p. 24). See also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.  The court reviews the Commissioner's decision to determine if an error of law was committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is

based on substantial evidence.  <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  <u>Reed</u>, 399 F.3d at 920 (quoting <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995)).  Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.  <u>See</u> <u>Smith</u>, 982 F.2d at 311.

## DISCUSSION

Plaintiff challenges the ALJ's decision on a number of grounds.   The issues posed by her are:

1.   Whether White Thunder's combined impairments equal listing 12.05C;[2]

2.   Whether the credibility assessment was supported by substantial evidence, legal criteria and sound reasoning;

3.   Whether the ALJ's residual functional capacity (RFC) assessment captured limitations resulting from "severe" and "non-severe" impairments;

4.   Whether the RFC complied with the *Nevland*[3] requirement that, in a step five case, RFC must be based on some examining medical evidence; and

---

[2]20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00.

[3]<u>Nevland v. Apfel</u>, 204 F.3d 853 (8th Cir. 2000).

4

> 5.   Whether White Thunder's cognitive and memory limitations met requirements of the step five jobs the ALJ found her capable of performing.

(Docket 18 at p. 18).  Each of plaintiff's challenges to the ALJ's decision will be separately addressed.

## 1.   Whether White Thunder's combined impairments equal listing 12.05C

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 404.1520(a)(4).  If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.  (Docket 16 at ¶ 50).

5

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526. If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, claimant is considered disabled. At step three the ALJ found Ms. White Thunder did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in Appendix 1. (Docket 16 at ¶ 54).

Ms. White Thunder takes issue with the ALJ's finding. (Docket 18 at pp. 19-23). She argues "[t]he [section] 12.05C [of Appendix 1] requirement for an additional impairment imposing significant work-related limitations is satisfied when the ALJ identifies any additional impairment as 'severe' at step two[4] of the sequential evaluation." Id. at p. 21. Because the ALJ "did not address Listing 12.05C criteria . . . [and] [s]ince the evidence and the

---

[4]At step two, the ALJ found "the following severe impairments: a history of ankle fracture, a history of a thoracic compression fracture, status post closed fractures of facial bones, liver damage, drug and alcohol abuse, dementia, a history of a closed head injury, a left shoulder injury and a history of left arm fracture." (Docket 16 at ¶ 52). Ms. White Thunder does not challenge this finding. (Docket 18).

6

law support her reliance on Listing 12.05C, the case should be decided in White Thunder's favor . . . ." Id. at pp. 22-23.

The court reviews *de novo* issues of law with deference given to the Commissioner's construction of the Social Security Act. Smith, 982 F.2d at 311. "The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months." Appendix 1 Listing 12.00.A. The introduction to Appendix 1 Mental Disorders explains how Listing 12.05, Intellectual disability,[5] is evaluated.

> Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. . . .

---

[5]The *Diagnostic and Statistical Manual of Mental Disorders*, fifth edition, replaced the term "mental retardation" with "intellectual disability." The regulations adopted this change. (Docket 18 at p. 20 n.15). When a witness, report or case uses the term "mental retardation" the court will use that term, otherwise the court will use the term "intellectual disability."

Id.  The introductory paragraph of Listing 12.05 referenced above states:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Appendix 1, Listing 12.05.

Ms. White Thunder relies on Listing 12.05(C) as her qualification for disability.  (Docket 18 at p. 23).  Listing 12.05(C) requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . ."  Appendix 1, Listing 12.05(C).

In analyzing the ALJ's decision, the court first must focus on the following preliminary question: Did Ms. White Thunder satisfy the requirements of the introductory paragraph of Listing 12.05, Mental Disorders?  Stated another way, the elements which must be proven are: Before age 22, does the evidence demonstrate Ms. White Thunder had (1) significant subaverage general intellectual functioning (2) with deficits in adaptive functioning?  "[T]he requirements in the introductory paragraph are mandatory."  Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).  However, the introductory paragraph does not require a "formal diagnosis of mental retardation."  Id.

Ms. White Thunder had a psychological consultative examination with Jackie Gilbertson, Ed.D., on January 6, 2011.  (Docket 16 at ¶ 172).   Ms. White Thunder was referred by the South Dakota Division of Disability Services.  Id.  Through testing, Dr. Gilbertson concluded Ms. White Thunder had a full scale IQ of 68.  Id. at ¶ 189.  All of plaintiff's index scores were within the impaired range and suggested global deterioration.  Id. at ¶ 190. On the Wechsler Memory Scale-III, her test result percentiles ranged from two to nine, where the highest attainable percentage would be 100 percent. Id. at ¶ 191.  These results suggested impairment in memory on a global basis.  Id.

Following her examination, testing and interview of Ms. White Thunder, Dr. Gilbertson's DSM-IV[6] diagnostic conclusions were:

Axis I:      305.00 Alcohol Abuse
             294.1  Dementia Due to Head Trauma

Axis II:     Deferred

Axis III:    Head Traumas
             Arthritis
             Facial Deformities
             Liver Damage
             Poor Eyesight

Axis IV:     Financial, Occupational, Support

---

[6] *Diagnostic and Statistical Manual of Mental Disorders*, fourth edition.

9

Axis V:       50[7]

(AR, p. 394-95; Docket 16 at ¶ 194).  In summary, Dr. Gilbertson reported:

> Karen is a cooperative individual who has limited cognitive abilities, as well as impaired memory.  She has sustained at least one closed head injury resulting in numerous significant scars on her face and deformity of the left side of her face.  She has had a long-term history of alcohol abuse, which most likely contributes to her current level of functioning.  She is a poor historian with chronology of information scattered.  Premorbid functioning is impossible to estimate although she did obtain a high school GED at age 19 . . . .

(AR, p. 395; Docket 16 at ¶ 194).

The ALJ concluded Ms. White Thunder did not satisfy the Listing 12.05© introductory criteria because there was no evidence she had significant subaverage general intellectual functioning, with deficits in adaptive functioning, before age 22.[8]  (AR, p. 16).  The record supports this finding.

Ms. White Thunder dropped out of high school in eleventh grade. (Docket 16 at ¶ 180).  She obtained her GED at age 19 in Job Corps.  Id. While in Job Corps, Ms. White Thunder had one and one-half years of formal training in food preparation.  Id.  The ALJ accepted Dr. Gilbertson's

---

[7]Global Assessment of Functioning ("GAF") score.  A GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life[.]"  Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003).

[8]The ALJ stated "there is no evidence that these impairments were present before the claimant's 21st birthday . . . ."  The court finds the age reference was a typographical error.

diagnosis Ms. White Thunder's "alcohol abuse and dementia [were] due to head trauma, an event that occurred during her auto accident on March 25, 2007. . . ." (AR, p. 16).  Dr. Atkin, a consulting psychologist, generally concurred with Dr. Gilbertson's conclusions.  "Dr. Atkin opined that the claimant had dementia, not mental retardation, and dementia was 'either secondary to chronic alcohol abuse or to a head injury. . . . And that's a different kind of thing th[a]n mental retardation.' " (Docket 16 at ¶ 6).

Ms. White Thunder's interpretation of the requirements of 12.05(C) is not correct.  She seeks to impose an analysis and determination of disability under Appendix 1 which are inconsistent with those legal requirements. Ms. White Thunder has not satisfied the introductory paragraph of 12.05(C). The conclusion of the ALJ at step three is supported by the substantial evidence in the record.  42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580.

**2.    WHETHER THE CREDIBILITY ASSESSMENT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE, LEGAL CRITERIA AND SOUND REASONING**

Plaintiff challenges the ALJ's rationale for making an adverse credibility assessment of Ms. White Thunder.  (Docket 18 at pp. 23-28).  She argues the "[t]estimony, function reports and third-party function reports showed that White Thunder's daily activities and social functioning were limited, not routine but intermittent; and many days she was non-functional: she did not shower, dress, socialize or do any housework.

Ms. White Thunder's 'daily' activities did not support the ALJ's credibility assessment (and RFC assessment)." Id. at pp. 23-24 (referencing Docket 16 at ¶¶ 25, 27, 29-31, 35, 40, 42, 68, 70-75, 77, 79-89). Plaintiff claims the ALJ did not consider Ms. White Thunder's poverty, the Indian Health Service care system or other obstacles to her accessing health care. Id. at p. 25.

As mentioned above, the role of the court is not to re-weigh the evidence and it may not reverse an ALJ's credibility findings because an opposite result may also be supported by substantial evidence. Guilliams, 393 F.3d at 801; Reed, 399 F.3d at 920. The court's role is to determine whether the ALJ's decision is supported by good reason and by substantial evidence. Guilliams, 393 F.3d at 801. The ALJ properly acknowledged he "must make a finding on the credibility of the statements [of Ms. White Thunder] based on a consideration of the entire case record." (AR, p. 19).

Ms. White Thunder testified at the hearing she could only stand for 15 to 20 minutes, sit for about one-half hour, and if she sat longer, her back hurt. (Docket 16 at ¶ 22). Moving about and walking for approximately a half-mile helped a lot. Id. Ms. White Thunder felt she could lift 25 pounds, but she had probably only lifted 10 pounds of potatoes. Id. Although Ms. White Thunder had previously taken Tramadol for pain, at the time of the hearing she was only using Ibuprofen. Id. at ¶ 23.

Ms. White Thunder testified her daily routine consisted of not sleeping well and then getting up at 6 a.m., having some coffee and then lying down again.  Id. at ¶ 25.  When she finally got up, she would have a light breakfast and then not do much for the remainder of the day.  Id.  Ms. White Thunder told the ALJ she only was able to sweep her house and do dishes, but standing at the sink hurt her back.  Id.  She testified she did not watch TV or read but mainly spent the day listening to the radio.  Id. at ¶ 29.  Ms. White Thunder testified her activities with her grandchildren who lived with her consisted of "[p]robably throw[ing] their clothes in the washer . . . [and] making them a peanut butter sandwich . . . ."  Id. at ¶ 27.  She testified she became dizzy just about every day, so she would have to lie down.  Id. at ¶ 37.  A neighbor testified Ms. White Thunder would walk about 100 yards from their homes to the store at Sharp's Corner.  Id. at ¶ 48.  Ms. White Thunder would sit down at the store and then again when she got home.  Id.

In an October 2010 function report, Ms. White Thunder reported she had no problems with personal care, she prepared two meals a day, and did household chores including laundry, washing dishes and sweeping without needing help or encouragement.   Id. at ¶¶ 93-95.  She reported her hobby was watching TV.  Id. at ¶ 98.

Ms. White Thunder told Dr. Norlin her daily activities consisted of getting up about 7 a.m., performing household chores, but needing

assistance at that time with laundry and vacuuming because of her right ankle fracture.  Id. at ¶ 161.  Dr. Norlin reported Ms. White Thunder told him she spent all day watching TV.  Id.  Dr. Norlin's assessment was:

> I think that she could sit for short periods, but standing and walking would be severely limited.  She would be able to lift light objects and carry them between waist and shoulder levels for limited amounts of time.  She was unable to bend or squat.  She was able to hear and speak but not travel independently.  She could perform daily self-care activities but "even repetitive motion of the hands is impaired."

Id. at ¶ 171.

Dr. Gilbertson reported Ms. White Thunder was able to tell time, the date, her social security number and that she was at the doctor's office. (Docket 16 at ¶ 179).  Dr. Gilbertson reported Ms. White Thunder indicated her daily activities included getting up around 6 a.m., making coffee, warming the house with the electric heaters, getting her grandchildren up and ready for school, then cooking, doing dishes and laundry and sweeping. Id. at ¶ 187.  Dr. Gilbertson identified Ms. White Thunder as a weekly binge drinker who otherwise displayed adequate abilities to interact with others. Id. at ¶ 186.  Ms. White Thunder acknowledged that when binge drinking other people would have to take care of her grandchildren.  Id. at   ¶ 194.

What Ms. White Thunder testified to at the hearing and what she told Drs. Norlin and Gilbertson is materially different.  The ALJ concluded "[a]ll of these behaviors and activities suggest that her testimony regarding her physical and mental limitations is not credible."  (AR, p. 21).  Because of the

inconsistencies in Ms. White Thunder's various reports and testimony, the ALJ is entitled to reject or give less credibility to her subjective complaints of pain and other limitations.  The ALJ's conclusion on credibility is supported by substantial evidence in the record.  Guilliams, 393 F.3d at 801.

**3.  WHETHER THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY (RFC) ASSESSMENT CAPTURED LIMITATIONS RESULTING FROM "SEVERE" AND "NON-SEVERE" IMPAIRMENTS**

Ms. White Thunder argues the ALJ failed to consider she was unable to complete work-related physical and mental activities eight hours a day, five days a week.  (Docket 18, at p. 28).  She asserts her daily activities do not convert into being able to complete the tasks necessary in the workplace.  Id.  Ms. White Thunder argues the ALJ failed to properly consider or incorporate into the RFC her non-severe visual impairment, together with the cognitive and memory limitations found by Dr. Gilbertson. Id. at pp. 28-29.

The ALJ concluded:

[Ms. White Thunder had the RFC] to perform light work as defined in 20 CFR 416.967(b) except that she can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climb, stoop, kneel, crouch and crawl and understand, remember and carry out simple instructions.

(AR, p. 18; Docket 16 at ¶ 55).  "Light work" is defined by Social Security Regulations as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

15

Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CRF § 416.967(b).

Ms. White Thunder argues her visual impairment, which was found to be nonsevere, made it difficult, if not impossible, to perform "jobs which required visual acuity." (Docket 18 at p. 29). "[I]f a nonsevere impairment is imposed on one or more severe impairments, the combined effect of all impairments must be considered in assessing a claimant's residual functioning capacity." Webber v. Secretary of Health & Human Services, 784 F.2d 293, 298 (8th Cir. 1986).

The ALJ considered Ms. White Thunder's visual impairment at step two. (AR, p. 13). The record supports the ALJ's finding that with new glasses, Ms. White Thunder's corrected vision would be 20/60 in the right eye and 20/25 in the left eye. Id. (referencing AR, pp. 357-58). The ALJ concluded Ms. White Thunder's "corrected visual acuity and activities demonstrate that she does not have a visual impairment that significantly limits her physical or mental ability to do basic work activities." Id. It is not necessary for the ALJ to restate the conclusion Ms. White Thunder's corrected vision does not significantly limit her physical ability to perform

16

simple work activities when calculating her RFC.  Ms. White Thunder fails to identify how this conclusion is erroneous or how the RFC should have been modified.

Ms. White Thunder objects to the ALJ's determination of RFC as it "failed to incorporate specific cognitive and memory limitations found by Dr. Gilbertson's WAIS-III and WMS-III tests."[9]  (Docket 18 at p. 29).  Dr. Gilbertson concluded Ms. White Thunder struggled with simple decisions and tasks and her ability to follow simple instructions was limited.  (Docket 16 at ¶ 193).  Dr. Gilbertson acknowledged that Ms. White Thunder's "long-term history of alcohol abuse . . . most likely contributes to her current level of functioning."  Id. at ¶ 194.

It was not Dr. Gilbertson's conclusion Ms. White Thunder could not work or that she had any long-term work-related limitations.  Contrary to Ms. White Thunder's argument the ALJ converted Dr. Gilbertson's opinions from "limited" to "limited but not precluded," the ALJ properly considered and applied Dr. Gilbertson's conclusions.   In doing so, the ALJ concluded "although Dr. Gilbertson stated that the claimant had a limited ability to follow simple instructions, she did not state . . . that she was

---

[9]See pp. 8-9 *infra*.  Ms. White Thunder's test scores and Dr. Gilbertson's opinions need not be repeated in this section.

unable to understand, remember or carry out simple instructions and did not limit her to sheltered work . . . ." (AR, p. 23).

Dr. Gilbertson's opinions were supported by or clarified by Dr. Atkin who articulated Ms. White Thunder's cognitive limitations in a work environment. Dr. Atkin acknowledged Ms. White Thunder's low test scores and concluded her dementia may make learning new tasks more difficult. Dr. Atkin also acknowledged Ms. White Thunder's long-term memory seemed intact and she would be capable of work involving simple, repetitive tasks. (Docket 16 at ¶¶ 7-11). His psychological evaluation was based on the medical record as a whole. Id. at ¶ 12.

The ALJ found "Dr. Atkin's testimony persuasive in view of the claimant's activities, her WAIS-III and WMS-III test results and the fact that she is alert, oriented and normally conversant at numerous routine physical exams with her treating providers. . . . [The ALJ gave] great weight to Dr. Atkin's expert opinions in concluding that she can perform work involving simple instructions . . . ." (AR, p. 23).

The ALJ's analysis and conclusions regarding Ms. White Thunder's cognitive and memory impairments are supported by the substantial evidence in the record. Guilliams, 393 F.3d at 801.

4. **WHETHER THE RFC COMPLIED WITH THE *NEVLAND* REQUIREMENT THAT, IN A STEP FIVE CASE, RFC MUST BE BASED ON SOME EXAMINING MEDICAL EVIDENCE**

Ms. White Thunder argues <u>Nevland</u>, 204 F.3d 853, mandates the ALJ must have medical evidence to support a claimant's RFC.  (Docket 18 at p. 30).  She argues "[c]ontrary to *Nevland*, the ALJ relied entirely on non-examining opinion[s] for his assessment of RFC.  The ALJ's RFC assessment was not supported by substantial evidence, and the sole reliance on non-examining consultant opinions to support the RFC assessment was reversible error."  <u>Id.</u>  "At the fifth step of the sequential evaluation process, the opinion of a non examining doctor usually is not 'substantial evidence on the record as a whole' and neither is the vocational expert's testimony when responding to a hypothetical based on the opinion of a non examining doctor."  <u>Turpin v. Colvin</u>, 750 F.3d 989, 993 (8th Cir. 2014) (quoting <u>Nevland</u>, 204 F.3d at 858).

Ms. White Thunder's reliance on <u>Nevland</u> is misplaced.  In <u>Nevland</u>, "there is no *medical* evidence about how Nevland's impairments affect[ed] his ability to function [at the time of the hearing]."  <u>Nevland</u>, 204 F.3d at 858 (emphasis in original).  In <u>Nevland</u>, the court concluded "the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity."  <u>Id.</u>

The record in this case is different from the <u>Nevland</u> record.  While there were no opinions of treating physicians, psychiatrists, or psychologists in <u>Nevland</u>, the record here includes examinations of Dr. Beliel (assessment: joint pain following MVA two years before), Dr. Livermont (right ankle fracture), Dr. Ekridge (surgical repair of ankle), Dr. Norlin (arthritis in back, shoulders and hip, liver damage due to alcohol abuse, poor eyesight and memory problems), and Dr. Gilbertson (reported above).  (Docket 16 at ¶¶ 145, 155, 157, 158-59 & 172).  While the ALJ relied on Dr. Atkin, a non-examining consultant physician, the ALJ also considered the treating physicians' treatment of Ms. White Thunder's physical injuries and resulting limitations, Dr. Gilbertson's mental evaluation, and Ms. White Thunder's own testimony in arriving at Ms. White Thunder's RFC and her ability to perform in the workplace.  <u>Turpin</u>, 750 F.3d at 994 (The ALJ is permitted to consider testimony of a non-treating physician, together with medical records, opinions of treating physicians and psychologists, and claimant's testimony).

5.   **WHETHER WHITE THUNDER'S COGNITIVE AND MEMORY LIMITATIONS MET REQUIREMENTS OF THE STEP FIVE JOBS THE ALJ FOUND HER CAPABLE OF PERFORMING**

The ALJ found at step five Ms. White Thunder was not disabled but capable of working as a sales attendant, a production assembler and a cleaner-housekeeping.  (Docket 16 at ¶ 59).  A vocational expert, William Tysdal, testified at the hearing.  (AR, pp. 74-79).  Ms. White Thunder did not

challenge Mr. Tysdal's qualifications to testify as a vocational expert.  Id. at p. 74.  The ALJ posed a hypothetical question to Mr. Tysdal incorporating Ms. White Thunder's RFC.  Id. at p. 75.  Mr. Tysdal testified Ms. White Thunder was qualified to work as a sales attendant, production assembler and cleaner-housekeeping.  (Docket 16 at ¶ 43).

Ms. White Thunder argues her cognitive and memory limitations preclude her from working in these positions.  (Docket 18 at p. 32).  She argues her reasoning levels are below the *Dictionary of Occupational Titles* ("*DOT*") aptitude levels required for all three positions.  Id.  at pp. 32-33.  Ms. White Thunder's "reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range. . . . The *DOT* itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010) (internal quotation marks and citations omitted).

Ms. White Thunder did not challenge the vocational expert's consideration of the reasoning limitations for each of the identified occupations.  "There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs."  Id.  The ALJ's

hypothetical question to the vocational expert is supported by substantial

evidence in the record and there is no identifiable conflict between the

expert's testimony and the DOT.  Id.  It was proper for the ALJ to rely on the

vocational expert's testimony.  42 U.S.C. § 405(g); Choate, 457 F.3d at 869;

Howard, 255 F.3d at 580.

## ORDER

Based on the above analysis, it is hereby

ORDERED that the plaintiff's motion (Docket 17) is denied.

IT IS FURTHER ORDERED that the defendant's motion to affirm the

Commissioner's decision (Docket 23) is granted.

Dated September 30, 2014.

BY THE COURT:

/s/ Jeffrey L. Viken
JEFFREY L. VIKEN
CHIEF JUDGE

22